## DAVIS v. ATLANTIC DREDGING CO.

(District Court, E. D. Pennsylvania. February 25, 1914.)

No. 69 of 1913.

TOWAGE (§ 12*)—STRANDING OF TOW—LIABILITY OF TUG.

> The stranding of a scow in tow alongside a tug, on a bar which was out of the tug's proper course, *held* due in part to the fault of the tug and in part to the fault of the scowman who was employed by her owner, and not by the tug, and who as soon as the scow struck opened one or more of her pockets and allowed the mud to slip to the bar around the scow which prevented the tug from releasing her.
>
> [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 24–26, 29; Dec. Dig. § 12.*]

In Admiralty. Suit by Samuel S. Davis, agent of the tug Harry Shaubel, Jr., against the Atlantic Dredging Company, with cross-libel. Decree for libelant.

Willard M. Harris, of Philadelphia, Pa., for Samuel S. Davis, agent.

Howard M. Long, of Philadelphia, Pa., for Atlantic Dredging Co.

JOHN B. McPHERSON, Circuit Judge. This libel was brought by Samuel S. Davis, representing the tug Harry Shaubel, Jr., to recover the contract price for towing services rendered to the Atlantic Dredging Company during the month of June, 1911. At the trial the tug's claim of $587 was proved to be correct, and the only controversy related to the setoff claimed by the company. It was averred in the cross-libel that in the performance of her contract the tug negligently stranded a scow belonging to the dredging company, thereby doing such injury as to put the scow out of commission for two months. If the tug was at fault, the remaining question is: How much shall the company be allowed?

The first inquiry therefore is whether the tug was negligent. The stranding occurred under the following circumstances:

On June 29 about the end of the day the tug with the scow lashed alongside was about to enter the back channel at League Island. The course she was taking was marked by one buoy at least, and was well known, and had been used, both by herself and by other tows. Some dredging had been done along the course, and there was sufficient water, even at the stage of the tide then prevailing, which was between flood and low water. The course could be safely used when the tide was at two-thirds flood. The scow was 125 feet long, 25 or 30 feet beam, with sides of 12 feet and four pockets to hold mud or sand. Three of the pockets were partly filled with mud, and she was drawing at least 4½ feet. Once in a while other tows had gone aground in that neighborhood; but such incidents caused little inconvenience, as the boats were always floated easily at high water. On this occasion, however, the tug by some miscalculation got out of the course a considerable distance, and put the scow on a bar near the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

entrance to the back channel at a place where stranding had not happened before. The tug remained afloat and tried to get the scow off, but she did not succeed; the reason being that the scowman—who was in the employ of the dredging company, and not of the tug—on his own motion and without orders from the tug released the doors of one or more of the pockets, with the result of letting the mud slip down a short distance to the bottom of the river, thus holding the scow firmly in place on an ebbing tide. After some effort the tug desisted for the day, and was discharged from the job on June 30 or July 1. After the dredging company itself had made ineffectual attempts to release the scow, the libelant was notified on July 11 or 12 to take her off, whereupon the tug was sent down, and on this occasion was successful. The scow was then removed a short distance and was overhauled at a convenient place on the shore. She had been leaking somewhat before the stranding, but no doubt the strain of the pulling under such conditions had done additional damage, and she was found to need repair. No survey was held, and the repairs were made by the dredging company's own men, but with so small a force and in so leisurely a manner that it was 62 days from the stranding before she was able to resume work.

In my opinion the liability for the injury must be divided between the parties. The tug should have known and should have been mindful of the course, and she was at fault for putting the scow on the bar. Indeed, her negligence is scarcely denied; the master of the tug was not called as a witness, and no one else attempted to explain or excuse the stranding. But the scowman, who was the dredging company's representative, was also at fault. He certainly contributed directly to the injury by releasing the pockets and anchoring the scow so firmly as to make her removal much more difficult, thus increasing the strain on the boat. The evidence seems to put these facts beyond doubt, and I shall not discuss them further.

The only question remaining is the allowance that should be made to the company. The total claim is $782.99, of which $240.49 is the cost of pumping and repairs, and $542.50 is for demurrage. The accuracy of the first item is not seriously in dispute, but the claim for demurrage is resisted. I agree that it is too large, and in my opinion the testimony does not warrant an allowance for more than 30 days. This includes the days when the scow was on the bar—to which no objection can be made—and also what I regard as a reasonable time for doing the subsequent work with proper speed. For its own convenience the time was prolonged by the company, and (while the cost of the repairs seems to be correct) the slowness with which the work was done should not operate against the libelant. Demurrage at $8.75 per day would amount to $262.50, or a total of $502.99. For half this sum the dredging company is entitled to credit, and a decree may therefore be entered in favor of the libelant for $337.50, with interest from, say, August 1, 1911, and costs.